## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SIERRA RUDMAN and CALYN BOYD, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| -vs- | )     Case No. CIV-22-0091-F <br> ) |
| STATE OF OKLAHOMA, *ex rel.* BOARD OF REGENTS FOR THE REGIONAL UNIVERSITY SYSTEM OF OKLAHOMA, and KAY ROBINSON, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) |

## ORDER

Plaintiffs Sierra Rudman (Rudman) and Calyn Boyd (Boyd) filed this civil action against defendants State of Oklahoma, *ex rel.* Board of Regents for the Regional University System of Oklahoma (Board) and Kay Robinson (Robinson) seeking to recover damages under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681(a), and 42 U.S.C. § 1983.  Rudman and Boyd claimed violations of their statutory rights under Title IX and violations of their constitutional rights under the First and Fourteenth Amendments.

The Board and Robinson moved for dismissal of Rudman and Boyd's First Amended Complaint pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6), Fed. R. Civ. P.  Upon review of the parties' submissions, the court entered an order (doc. no. 41) which (1) granted Robinson's motions to dismiss seeking to dismiss Rudman and Boyd's § 1983 claims (Fourteenth Amendment procedural and substantive due process and equal protection claims and First Amendment free speech claims) under

Rule 12(b)(5) and Rule 12(b)(6), and dismissed the § 1983 claims without prejudice; (2) granted the Board's motion to dismiss seeking to dismiss Rudman's Title IX claim under Rule 12(b)(5) and Rule 12(b)(6) and dismissed the Title IX claim without prejudice; (3) denied the Board's motion to dismiss seeking to dismiss Boyd's Title IX claim but quashed Boyd's service of process on the Board; and (4) granted Rudman and Boyd leave to file a Second Amended Complaint.

In accordance with the court's order, Rudman and Boyd filed a Second Amended Complaint (doc. no. 44), re-alleging their claims under Title IX and § 1983. The Board and Robinson have filed motions to dismiss challenging Rudman's claims under Rule 12(b)(6).[1]

## I.

### *Legal Standards*

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). In reviewing a motion to dismiss, the court assumes the truth of "all well-pleaded facts in the complaint, and draw[s] all reasonable inferences therefrom in the light most favorable to the plaintiff[]." Dias v. City & Cty. of Denver, 567 F.3d 1169, 1178 (10th Cir. 2009).

Robinson, who is sued in her individual capacity, raises the defense of qualified immunity. When a defendant asserts a qualified-immunity defense, the

---

[1] Robinson also filed a motion to dismiss challenging Boyd's § 1983 claims against her. *See*, doc. no. 49. That motion, which was uncontested by Boyd, was granted. *See*, doc. no. 55. Boyd's § 1983 claims against Robinson were dismissed with prejudice based upon qualified immunity. *Id*.

burden shifts to the plaintiff to allege facts sufficient to show "(1) that the defendant violated a constitutional or statutory right (2) that was clearly established at the time of the conduct in question." Dahn v. Amedei, 867 F.3d 1178, 1185 (10th Cir. 2017). The court "can decide which prong to address first, and need not address both." Id.

"A constitutional right is clearly established if it is sufficiently clear that every reasonable official would have understood that what [s]he is doing violates that right." Doe v. Woodard, 912 F.3d 1278, 1289 (10th Cir. 2019) (quotation marks and citations omitted). "The plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Id. "Generally, existing precedent must have placed the statutory or constitutional question beyond debate for a right to be clearly established." Id. (quotation marks and citations omitted).

## II.

### Relevant Factual Allegations from the Second Amended Complaint

The well-pleaded factual allegations in the Second Amended Complaint as to plaintiff Sierra Rudman are as follows:

Rudman is a former student of the University of Central Oklahoma (UCO), which is a public four-year college operated by the Board. UCO is a recipient of federal funds and is subject to Title IX.

At all relevant times, UCO had a Title IX policy, which prohibited all forms of sexual or sex-based harassment or discrimination, or sexual misconduct, including sexual violence, sexual assault, and stalking.

In addition, UCO had a general anti-discrimination and anti-harassment policy and a sexual discrimination and harassment investigation policy. It also had a student code of conduct (student code), which prohibited hazing.

Boyd is a former employee of UCO.  She held the position of Coordinator of Student Engagement for the Division of Enrollment and Student Success from July 2018 until September 2020.  One of the individuals Boyd reported to was Robinson, who held the position of Senior Director of Student and Community Engagement. As part of her job duties, Robinson was responsible for UCO's Spirit Teams, including the Cheer Team.

During her employment, Boyd was a mandatory reporter of sexual harassment, sexual exploitation, sexual discrimination, and hazing.  She received Title IX training and was considered a "Responsible Employee" at UCO for purposes of Title IX.  As a "Responsible Employee," she had the legal duty to report any incidents of sexual harassment, sexual discrimination, or other violations of Title IX.  Doc. no. 44, ¶ 12.

At UCO, several campus organizations conducted events where upper-class students were appointed to mentor or guide new or under-class students.  One of those organizations was the Cheer Team.  It held such an event, known as the Big Sister/Little Sister Reveal (Big/Little Reveal).  This annual event was broken down into two smaller events:  one "Official," supervised and led by UCO employees and representatives, and one "Unofficial."  Doc. no. 44, ¶ 16.

In the summer of 2019, Boyd reported to Robinson that she had learned of sexual exploitation and harassment hazing, which occurred at the Cheer Team's "Unofficial" Big/Little Reveal event ("Unofficial" event) in August of 2018. Robinson said she would "look into it," but she did nothing to investigate or prevent the sexual exploitation or harassment hazing Boyd was reporting.  Doc. no. 44, ¶¶ 17-18.

Rudman participated in the Cheer Team from February or March 2020 until the spring of 2021.  On or around August 13, 2020, Rudman was invited to attend the Big/Little Reveal.  The "Official" Big/Little Reveal event ("Official" event) took

place on UCO property and was attended by at least one UCO employee, Jenni Hawkins (Hawkins).  Doc. no. 44, ¶ 76.  Hawkins was the coach of the Cheer Team.

After the "Official" event, the Cheer Team left to attend the "Unofficial" event.  Doc. no. 44, ¶ 76.  The "Unofficial" event was held at an off-campus residence of two upper-class Cheer Team members.  *Id*., ¶ 31.  At least seven other new Cheer Team members, including males, attended the "Unofficial" event.  *Id*., ¶ 32.  Upon arrival, Rudman was told to surrender her car keys and cell phone.  Like other new Cheer Team members, she was blindfolded and taken into the house. Although they were minors, she and other new members were provided alcohol. They were taken to a bedroom and ordered to perform a "lap dance" on each other. Doc. no. 44, ¶ 35.  They were also asked sexual questions.  In addition, the new Cheer Team members were ordered to take off their shirts and the upper-class Cheer Team members poured alcohol and ice-cold water under their bras and directly on their chests.  The new Cheer Team members were ordered to "grind" (move up and down in a sexual way) on objects.  *Id*. at ¶ 38.  Because she was blindfolded, Rudman was unable to see other persons in the room and felt as if either male or female members of the Cheer Team would sexually assault her.  According to Rudman, the new members stayed in the bedroom for about an hour, and they were blindfolded in the house for five to six hours.

At the conclusion of the event, the new Cheer Team members, who were heavily intoxicated, were ordered out of the residence and told to find their own way home.

Robinson and Hawkins mandated attendance at the "Unofficial" event.  Doc. no. 44, ¶¶ 79, 145.  If any new Cheer Team members had refused to attend, Hawkins would have punished them by preventing them from participating in Cheer Team activities "on the mat."  *Id*. at ¶ 79.  The upper-class Cheer Team members reported new Cheer Team members to Hawkins if they failed to follow their instructions and

Hawkins would discipline the new Cheer Team members based entirely on the upper-class Cheer Team members' reports. *Id.*, ¶ 80.

The upper-class Cheer Team members who had inflicted the hazing and sexual exploitation on the new Cheer Team members, including Rudman, had themselves been hazed and sexually exploited in the years immediately preceding. Doc. no. 44, ¶¶ 72, 144. They continued the hazing and sexual harassment/ exploitation because they believed it was a "rite of passage." Doc. no. 44, ¶ 72. They also characterized the "Unofficial" event as "Team Bonding" carried out so they could "bond as a group" and that the event was "successful." Doc. no. 44, ECF p. 6 n. 1.

Later in the 2020-2021 school year, a dispute occurred between some Cheer Team members and Hawkins. The matter was referred to a UCO dean. The official caused an anonymous survey to be distributed to the Cheer Team members and their parents. One of the survey participants disclosed the sexual abuse and hazing during the August 2020 "Unofficial" event.

Rudman first learned of an investigation into the event when a local news source published findings of the survey in March 2021. The information was disclosed by UCO's media outlet.

UCO made no effort to warn Rudman that what had happened to her during the event would become public knowledge, and she was blindsided by the public learning of her being victimized by hazing.

After the news story broke, the Cheer Team members began discussing the contents of the story and the facts about the "Unofficial" event on the Cheer Team GroupMe chat. The upper-class Cheer Team members threatened the new Cheer Team members, including Rudman, with physical harm and their safety if they did not remain quiet about the abuse they suffered.

Robinson and Hawkins learned of the Cheer Team members' comments and called a meeting in March 2021.  Robinson told the Cheer Team that if they did not stay quiet about the "Big/Little Reveal" or any other hazing activities, she would dissolve the GroupMe chat.  Doc. no. 44, ¶ 51.  Rudman observed Robinson, and it appeared to her from Robinson's demeanor that she had prior knowledge of the Cheer Team's hazing practices.  During the meeting, other Cheer Team members spoke about the same sort of hazing that took place at the "Unofficial" event over previous years.

Robinson told the Cheer Team members present at the meeting that they needed to keep their mouths shut about the hazing incident, and not to discuss it among themselves or with anyone in the public.  Robinson said this could result in the Cheer Team getting into trouble.  Doc. no. 44, ¶ 55.  She further told them to keep their mouths shut as she believed the publicity surrounding the media reporting on the contents of the survey would "probably blow over."  *Id.*, ¶ 85.

Thereafter, Robinson dissolved the GroupMe chat, rendering it impossible for Rudman or any Cheer Team members to screenshot the posts of individual members, and destroyed all evidence of its existence and content.

Rudman was told that if she were ever to mention the hazing incident, she would not be allowed to set foot on the cheerleading mat, compete for a championship, or letter as a cheerleader.

Because Rudman was known throughout the UCO campus as a cheerleader, the student population knew she had been victimized by hazing.  As a result of the public disclosure of the hazing, Rudman was humiliated and felt alone on campus. She suffered severe emotional distress, made worse because she had to discuss what happened with her mother and grandmother.  Her grades worsened, and she became more withdrawn from school activities.  She left UCO at the end of the school year. She moved out of state and is attending classes elsewhere.

The Cheer Team program was suspended for two years by UCO.

Upper-class Cheer Team members told Rudman that they had discussed with Robinson the hazing that they had experienced. They told her that Robinson and Hawkins had personally attended an "Unofficial" event and witnessed hazing and sexual harassment/exploitation on new Cheer Team members. *Id.*, ¶ 77. According to the upper-class Cheer Team members, Robinson and Hawkins told them they stopped attending the "Unofficial" event because they knew that allowing the hazing and sexual harassment/exploitation could get them into trouble with UCO. *Id.*, ¶ 78.

The upper-class Cheer Team members also told Rudman that Robinson was shown videos taken of the hazing and sexual harassment/exploitation activities occurring at the "Unofficial" event. Doc. no. 44, ¶ 82. The hazing and sexual harassment/exploitation had been moved off campus at the insistence of Robinson and Hawkins as they were concerned that the activities were unlawful. Indeed, Robinson ordered the "Unofficial" event off campus. *Id.*, ¶ 144. According to Boyd, Robinson had the responsibility to direct UCO students hosting off-campus activities not to engage in hazing or sexual harassment/exploitation. *Id.*, ¶ 74. Robinson could provide training and education as to what constituted hazing and sexual abuse and could enforce consequences of unlawful actions, even off campus. *Id.*, ¶ 75. And according to UCO policy and an employee of UCO, Robinson had the authority to supervise the Cheer Team at the "Unofficial" event and to order the event to be terminated. *Id.*, ¶ 145.

In the Second Amended Complaint, Rudman asserts a Title IX claim of deliberate indifference to known acts of student-on-student sexual harassment against the Board. In addition, she alleges Fourteenth Amendment procedural and substantive due process and equal protection claims and First Amendment free speech claims against Robinson.

III.

*Rudman's Title IX Claim Against the Board*

Title IX Claim – Deliberate Indifference to Known Acts of Student-on-Student
Sexual Harassment

Rudman claims UCO discriminated against her on the basis of sex in violation
of Title IX.  The statute states that "[n]o person . . . shall, on the basis of sex, be
excluded from participation in, be denied the benefits of, or be subjected to
discrimination under any education program or activity receiving Federal financial
assistance."  20 U.S.C. § 1681(a).  The Supreme Court has recognized that sexual
harassment is a form of discrimination on the basis of sex and is actionable under
Title IX.  *See*, Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992).
It has determined that Title IX may be enforced through a private right of action
against a recipient of federal education funds and that a damages remedy is available
for violations.  *See*, Cannon v. University of Chicago, 441 U.S. 677, 709 (1979);
Franklin, 503 U.S. at 76.

In Davis Next Friend LaShonda D. v. Monroe County Board of Education,
526 U.S. 629, 643, 648 (1999), the Supreme Court specifically recognized that a
recipient of federal education funds can be held liable in damages under Title IX
where the recipient is deliberately indifferent to known acts of student-on-student
sexual harassment.  *Id*.  The Tenth Circuit has ruled that to state a Title IX claim
based upon deliberate indifference to known acts of student-on-student sexual
harassment, a plaintiff must allege that the funding recipient "'(1) had actual
knowledge of, and (2) was deliberately indifferent to (3) harassment that was so
severe, pervasive and objectively offensive that it (4) deprived the victim of access
to the educational benefits or opportunities provided by the school.'"  Doe v. School
District Number 1, Denver, Colorado, 970 F.3d 1300, 1308 (10th Cir. 2020) (quoting
Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1246 (10th Cir. 1999)).

While the Supreme Court in <u>Davis</u> recognized Title IX liability for a funding recipient's deliberate indifference to known acts of peer sexual harassment, it also explained that the liability is limited to circumstances "wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs."   <u>Davis</u>, 526 U.S. at 645.   As the Supreme Court explained:

> The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and *the environment in which the harassment occurs*.  If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment.  That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.  Moreover, because the harassment must occur under the operations of a funding recipient, the harassment *must take place in a context subject to the school district's control*.

*Id*. at 644-645 (internal quotation marks, citations, definitions, and alterations omitted) (emphasis added).

The student misconduct at issue in <u>Davis</u> occurred during school hours and on school grounds.  Indeed, the bulk of it took place in the classroom.  526 U.S. at 646. The Supreme Court concluded that, in those circumstances, the funding recipient "retain[ed] substantial control over the context in which the harassment occur[red]." *Id*.  In addition, in that setting, the funding recipient "exercise[d] significant control over the harasser."  *Id*.

The Board does not challenge whether the Second Amended Complaint alleges facts sufficient to show that it had substantial control over the harassers. Instead, as with its prior dismissal motion, the Board asserts that the amended pleading fails to allege facts sufficient to establish that it had substantial control over

the context in which the hazing and sexual harassment/exploitation occurred. The Board points out that the hazing and sexual harassment/exploitation did not take place on campus. Rather, it occurred at an off-campus residence of two upper-class Cheer Team members. The residence, the Board emphasizes, was neither owned nor controlled by UCO. And it asserts that there are no factual allegations to indicate that UCO had any authority to regulate the private residence or the activities that occurred there. Further, the Board emphasizes that this court previously found that UCO's disciplinary authority over the Cheer Team, by itself, was not sufficient to establish that it controlled the location or context in which the members committed the sexual misconduct.[2]

Additionally, the Board contends that there are no factual allegations in the Second Amended Complaint to establish two of the essential elements of a Title IX claim – actual knowledge and deliberate indifference. According to the Board, the amended pleading's allegations do not show that UCO had actual knowledge of a substantial risk of abuse to Rudman. The Board also contends that that the Second Amended Complaint sets forth only vague and conclusory statements of deliberate indifference by UCO. Consequently, the Board argues that Rudman's Title IX claim against it fails as a matter of law.

In its prior ruling dismissing Rudman's Title IX claim, the court found the Board's substantial control argument to be dispositive. However, viewing the factual allegations of the Second Amended Complaint and all reasonable inferences

---

[2] In its previous order, the court did conclude that disciplinary authority over the Cheer Team members was not enough by itself to establish that the university controlled the location or context in which the members committed sexual misconduct. *See*, doc. no. 41, ECF p. 15. The only circuit decision cited by the court for that conclusion was Brown v. State, 23 F.4th 1173, 1182 (9th Cir. 2022). The court notes that after its decision, the Ninth Circuit vacated the decision and ordered the case to be reheard *en banc*. Brown v. Arizona, No. 20-15568, 56 F.4th 1169 (9th Cir. Dec. 9, 2022). No *en banc* decision has yet been issued.

from those facts in Rudman's favor, the court concludes that Rudman has now alleged facts sufficient to avoid dismissal on the substantial control issue.

In her briefing, Rudman again relies primarily upon a Kansas district court case, <u>Weckhorst v. Kansas State University</u>, 241 F. Supp. 3d 1154, 1169-70 (D. Kan. 2017), *aff'd* <u>Farmer v. Kansas State University</u>, 918 F.3d 1094 (10th Cir. 2019), to support that UCO had substantial control over the context in which the alleged harassment occurred.

In <u>Weckhorst</u>, the plaintiff, a female Kansas State University (KSU) student, attended an off-campus fraternity event where she became extremely intoxicated and blacked out. *Id*. at 1159. A male KSU student, and the fraternity's designated driver, took the plaintiff to his truck and raped her in front of about fifteen university students, some of whom took photographs and videos. *Id*. He then drove the plaintiff back to the off-campus fraternity house and assaulted her on the way. *Id*. When they arrived at the fraternity house, he took her to a "sleep room" lined with beds and raped her again. *Id*. He left her there, naked and passed out. *Id*. When she woke up several hours later, another member of the fraternity was raping her. Still intoxicated, she left the room and made her way to a nearby patio. The fraternity member followed her onto the patio and raped her again. *Id*. Photographs and videos were later circulated widely on social media. *Id*. at 1159-60. After the plaintiff filed a complaint, the university advised that it would not investigate or take any action against the fraternity members because the rapes had occurred off campus. *Id*. at 1160-63. The plaintiff suffered from post-traumatic stress disorder symptoms. She stopped going to classes, was forced to withdraw from a math course, and lost a prestigious scholarship. *Id*. at 1163-64.

The plaintiff filed an action against KSU alleging a violation of Title IX. On a Rule 12(b)(6) motion, the university argued that the harassment did not occur within one of its programs or activities because it had no substantial control over the

context in which the off-campus rapes occurred. *Id*. at 1165-66. The district court disagreed. In determining that KSU had substantial control over the context in which the rapes occurred, so as to warrant imposition of liability under Title IX, the court cited the following factual allegations:

> (1) KSU fraternities are student housing organizations that are open only to KSU students, and on its website, KSU describes its fraternities as 'Kansas State University Organizations'; (2) the director of the fraternity at issue in this case is a KSU instructor; (3) KSU promotes its fraternities on its website and to prospective students and parents; (4) KSU employs five individuals on campus in its Office of Greek Affairs, which is responsible for carrying out a number of functions to support fraternities and sororities, including administrative assistance, advisory responsibilities, education and development, serving as a liaison to chapter presidents, holding regular meetings with chapters, and conducting chapter assessments; (5) KSU has authority to regulate fraternity houses, and promulgates rules for regulating parties and certain other activities at fraternity houses and events; and (6) Dean of Student Life, Pat Bosco, approved the KSU [Interfraternity Council's] decision to 'suspend the fraternity for the alcohol at the party at which Plaintiff was raped.'

*Id*. at 1167.

The court also found that KSU had substantial control over the fraternity members because they were students at KSU and were under the disciplinary control of KSU. *Id*. The court concluded that while the plaintiff's allegations did not reflect that "KSU had *complete* control over the alleged assailants at the fraternity house or the fraternity parties, her allegations [did] reflect that KSU had *substantial* control over both the assailants and the fraternity." *Id*. at 1168 (emphasis in original).

In the case at bar, the court previously found that Rudman's allegations in the First Amended Complaint fell short of the Weckhorst fact pattern which established

the university had substantial control over the context in which the harassment occurred.  The court concluded that Rudman's factual allegations did not indicate that UCO had any authority to regulate the private residence of the Cheer Team members, or the parties and events held by Cheer Team members at that residence.  Nor did the factual allegations indicate that UCO promulgated rules regulating parties or other activities at the Cheer Team members' private residences.  The court, however, concludes that the new allegations, along with other allegations in the Second Amended Complaint, viewed in a light favorable to Rudman, are sufficient, like the allegations in Weckhorst, to indicate that UCO had substantial control over the harassers and the context in which the harassment occurred.  The allegations indicate that UCO, through Robinson and Hawkins, had the authority to regulate (which in this case would mean prohibit) the Cheer Team members' hazing and sexual harassment/exploitation activities that occurred at the off-campus residence of two of the Cheer Team members.  In the court's view, they indicate that UCO retained substantial control over the context in which the hazing and sexual harassment/exploitation of Rudman occurred.

Specifically, according to the allegations, the Cheer Team was one of UCO's constituent organizations exclusively for UCO students.  UCO employed Robinson, who was responsible for the Cheer Team, and Hawkins, who was the Cheer Team coach.  Each year, the Cheer Team held the Big/Little Reveal, consisting of both an "Official" event and an "Unofficial" event.  Boyd reported to Robinson in the summer of 2019 that she received a report from a new Cheer Team member of sexual exploitation and harassment hazing that occurred at the "Unofficial" event in 2018.  Several upper-class Cheer Team members had also discussed with Robinson the hazing they had previously experienced at the "Unofficial" event.  In addition, Robinson and Hawkins had personally attended the "Unofficial" event and witnessed the hazing and sexual harassment/exploitation inflicted on the new Cheer

Team members.  They had also been shown videos taken of the hazing and sexual harassment/exploitation activities at the "Unofficial" event.  Although the "Official" event was held on campus, the "Unofficial" event was moved off-campus at the insistence of Robinson and Hawkins as they were concerned that the activities were unlawful.  Indeed, Robinson ordered it off campus.  And Robinson and Hawkins stopped attending the "Unofficial" event because they knew the hazing and sexual harassment/exploitation could get them into trouble.

Although an "Unofficial" event, attendance by the new Cheer Team members was mandated by Robinson and Hawkins.  If they refused to attend, Hawkins would have the members punished by preventing them from participating in the Cheer Team activities "on the mat."  And Hawkins disciplined new Cheer Team members based entirely on the reports of the upper-class Cheer Team members.

According to Boyd, Robinson, who was her supervisor, had the responsibility to direct UCO students hosting off-campus not to engage in hazing or sexual harassment/exploitation-type behavior.   Robinson could provide training and education as to what constituted hazing and sexual abusive and could enforce consequences of unlawful actions, even off campus.  Further, according to UCO policy and an employee of UCO, Robinson had the authority to supervise the "Unofficial" event and to order that it be terminated.

After the 2020 "Unofficial" event which Rudman attended was revealed, and disclosed publicly, Robinson and Hawkins met with the Cheer Team members, and Robinson told them to keep their mouths shut about the incident as it could result in the Cheer Team program getting into trouble.  Robinson believed the publicity surrounding the media reporting on the incident would "probably blow over." Ultimately, the Cheer Team program was suspended by UCO for two years due to the incident.

The Tenth Circuit Court of Appeals has recognized that harassment occurring off school grounds may give rise to liability under Title IX. *See*, Rost ex rel. K.C. Steamboat Springs RE-2 School Dist., 511 F.3d 1114, 1121 n. 1 (10th Cir. 2008). According to the Court of Appeals, "there must be some nexus between the out-of-school conduct and the school" to create that liability. *Id*. The court concludes that Rudman's factual allegations in the Second Amended Complaint are sufficient to establish a meaningful nexus between UCO and the off-campus hazing and sexual harassment at the Cheer Team members' private residence, so as to render the Board liable under Title IX for the hazing and sexual harassment/exploitation. Unlike the allegations in the First Amended Complaint, the factual allegations in the Second Amended Complaint do support a reasonable inference that the hazing and sexual harassment/exploitation took place in a context subject to UCO's control. *See*, Davis, 526 U.S. at 630. The court concludes that Rudman's Title IX claim for deliberate indifference to known acts of student-on-student sexual harassment is not subject to dismissal under Rule 12(b)(6) on the ground of a lack of substantial control over the context in which the harassment occurred.

As stated, the Board also challenges whether the factual allegations in the Second Amended Complaint are sufficient to establish the essential elements of actual knowledge and deliberate indifference. The court concludes that the factual allegations are sufficient to establish that Robinson had actual knowledge of the hazing and sexual harassment/exploitation that occurred at the "Unofficial" event held by the Cheer Team members.[3] Robinson had attended the event previously and

---

[3] "To trigger Title IX liability, a university must have actual notice through an appropriate person." Ross v. University of Tulsa, 859 F.3d 1280, 1288-89 (10th Cir. 2017). "An appropriate person 'is, at a minimum, an official of the [university] with authority to take corrective action [on behalf of the university] to end the discrimination.'" *Id*. (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998)). The court concludes that the factual allegations and reasonable

had witnessed hazing and sexual harassment/exploitation.  She had also seen videos of hazing and sexual harassment/exploitation that occurred previously.  Boyd, as part of her job duties, had also reported to Robinson about the harassment that occurred in 2018.  Upper-class Cheer Team members had discussed their prior hazing and sexual harassment/exploitation experience with Robinson.  Based on the allegations and reasonable inferences from those allegations, viewed in Rudman's favor, Robinson had actual knowledge of hazing and sexual harassment/exploitation in the Cheer Team program prior to the 2020 "Unofficial" event.  Escue v. Northern Oklahoma College, 450 F.3d 1146, 1153 (10th Cir. 2006) ("[H]arassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX.") (citing Gebser, 524 U.S. at 290).  The court concludes that the prior similar instances of hazing and sexual harassment/exploitation that occurred to other new Cheer Team members provided Robinson "with actual knowledge that [the upper-class Cheer Team members] presented a 'substantial risk of [hazing and sexual harassment/exploitation]'" to Rudman at the 2020 "Unofficial" event.  Escue, 450 F.3d at 1154.

The court also concludes that the factual allegations are sufficient to establish the deliberate indifference element.  A university is deliberately indifferent to acts of student-on-student harassment "only where the . . . response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  Davis, 526 U.S. at 648.  Despite being aware of the sexual misconduct occurring at prior annual "Unofficial" events for the Cheer Team and having the ability to terminate it and enforce consequences of unlawful actions, Robinson did not take any action to stop the 2020 "Unofficial" event.  Viewing the factual allegations and reasonable

---

inferences drawn in Rudman's favor are sufficient to establish that Robinson was an "appropriate person" through whom the university could have obtained actual acknowledge for purposes of Title IX liability.

inferences therefrom in a light favorable to Rudman, the court concludes that a reasonable jury could conclude that the lack of response by Robinson was clearly unreasonable.

Because the factual allegations sufficiently plead actual knowledge and deliberate indifference, the court concludes that Rudman's Title IX claim should not be dismissed under Rule 12(b)(6). The Board's motion will therefore be denied.

IV.

*Section 1983 Claims Against Defendant Robinson*

<u>Procedural and Substantive Due Process Claims</u>

Rudman asserts that Robinson violated her Fourteenth Amendment procedural and substantive due process rights by depriving her of her education and educational activities. The Fourteenth Amendment protects citizens from, among other things, deprivation of property without due process of law. U.S. Const. amend. XIV, § 1. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." <u>Hyde Park Co. v. Santa Fe City Council</u>, 226 F.3d 1207, 1210 (10th Cir. 2000). To state either a procedural or substantive due process claim, "a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest." *Id*. A property interest in the context of the Fourteenth Amendment Due Process Clause is a "legitimate claim of entitlement" to some benefit, as opposed to a mere "abstract need or desire" or "unilateral expectation." <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972).

In her papers, Robinson argues that Rudman cannot state a procedural or substantive due process claim because cheerleading is not a protectible property interest. To the extent that Rudman claims that her continued education is a

protectible property interest, Robinson contends that Rudman fails to allege facts to show that Robinson denied her an education.  Robinson points out that Rudman was not suspended or removed from UCO or otherwise kept from attending classes. Further, to the extent Rudman relies upon the theory of "constructive expulsion" to support her claims, Robinson argues that the Second Amended Complaint, like the First Amended Complaint, fails to state facts to establish that she was constructively expelled from UCO.  Robinson contends that the new allegations do not show that she deliberately created an intolerable environment in order to force Rudman to leave campus or that the conditions were so objectively intolerable that Rudman had no choice but to leave.  Lastly, Robinson points out that even if Rudman has alleged facts to establish a plausible procedural due process claim or substantive due process claim, she has not identified clearly established law permitting a procedural due process claim or substantive due process claim based on the "constructive expulsion" theory.

Rudman responds that she had a protected property interest in her continued education at UCO.  She also contends that she was deprived of that property interest by Robinson because her environment became so objectively intolerable that she was subjected to "constructive expulsion" from the university.  According to Rudman, the facts, as now pled, plausibly establish that she was forced out of UCO. Further, she contends that it was Robinson's actions that created the intolerable environment.

As the court previously ruled, Rudman had a protected property interest in her continued education at UCO.  *See*, Gaspar v. Bruton, 513 F.2d 843, 850 (10th Cir. 1975); Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1181 (10th Cir. 2001).  And the court assumes without deciding that Rudman may be able to show deprivation of a property interest in continued education through "constructive expulsion."  *See*, Garcia v. Clovis Municipal Schools, Case

No. CIV 02-1101 WJ/KWR, 2003 WL 27385436, at *4 (D.N.M. March 3, 2003) (discussing <u>Seamons v. Snow</u>, 84 F.3d 1226, 1234 (10th Cir. 1996), and <u>Stevenson v. Martin County Bd. of Educ.</u>, No. 99-2685, 2001 WL 98358 (4th Cir. Feb. 6, 2001)).

However, the court again concludes that new allegations, along with the other allegations in the Second Amended Complaint, do not give rise to a reasonable inference that Robinson "deliberately created an intolerable environment in order to force [Rudman] to leave and that the conditions within the [university] were so objectively intolerable that [Rudman] had no choice but to leave." <u>Garcia</u>, 2003 WL 27385436, at *4.

Construed in her favor, the Second Amended Complaint alleges that Rudman was subjected to hazing, sexual harassment and sexual exploitation at the annual Cheer Team "Unofficial" Big/Little Reveal event in August 2020;  Robinson, who had actual knowledge of hazing, sexual harassment and sexual exploitation occurring at previous "Unofficial" events, mandated that Rudman attend the event or be subject to punishment by Hawkins; the hazing, sexual harassment and sexual exploitation was disclosed by one survey participant in the spring of 2021; UCO disclosed to the media what happened to Rudman and other new Cheer Team members during the "Unofficial" event in 2020; Rudman did not know about an investigation into the "Unofficial" event until it was disclosed to the media, and UCO did not warn her that what happened at the "Unofficial" event would be made public knowledge; the upper-class Cheer Team members threatened the new Cheer Team members' physical safety and accused them of "ratting out" the "Unofficial" event and the hazing; Robinson told the Cheer Team members to stay quiet about the Big/Little Reveal or any other hazing activities or she would dissolve the Cheer Team's GroupMe Chat; Robinson told the Cheer Team members to keep their mouths shut about the Big/Little Reveal and to not discuss it among themselves or with anyone in the public to avoid the Cheer Team program getting into trouble and

because she believed the publicity on the contents of the survey would "probably blow over;"[4] Robinson dissolved the GroupMe Chat, rendering it impossible for Rudman to screenshot the posts by individual Cheer Team members, and Robinson destroyed all evidence of its existence and content; the student population knew Rudman had been victimized by the hazing and sexual abuse because she was known as a cheerleader; and as a result of the public disclosure of the hazing and sexual abuse, Rudman was humiliated and felt alone on campus, suffering emotional distress which was made worse because she had to discuss what happened to her with her mother and grandmother; her grades gradually worsened, and she became more withdrawn from school activities.

While the court, as previously explained in its prior ruling, does not minimize how difficult these experiences must have been for Rudman, the court concludes that the circumstances alleged by Rudman are not sufficient to demonstrate that her learning conditions at UCO were such that a reasonable person would have felt compelled to leave the university.  Further, the factual allegations, in the court's view, are insufficient to show that Robinson deliberately created an intolerable environment in order to force Rudman to leave UCO.[5]  Thus, the court concludes that Rudman fails to allege facts sufficient to establish deprivation by Robinson of her protected property interest in continued education at UCO.  As a result, the court concludes that Rudman fails to allege facts establishing that she has plausible

---

[4] In her pleading, Rudman alleges that she was told that if she ever mentioned the hazing incident, she would never be allowed to set foot on the cheerleading mat, compete for a championship or letter as a university cheerleader.  Rudman, however, does not allege that Robinson made those statements to her.

[5] The court notes there are no factual allegations that Robinson was involved in disclosing the "Unofficial" Big/Little Reveal event to the public.

procedural and substantive due process claims against Robinson under the first prong of the qualified immunity analysis.[6]

Additionally, the court concludes that even if Rudman has alleged facts sufficient to state plausible procedural and substantive due process claims, Robinson would still be entitled to qualified immunity under the second prong of the analysis. In her papers, Rudman has not identified clearly established law permitting a procedural due process claim or substantive due process claim based on the "constructive expulsion" theory. Rudman relies upon the district court's decision in Garcia. That is not sufficient. *See*, Ullery v. Bradley, 949 F.3d 1282, 1300 (10th Cir. 2020) ("'[D]istrict court decisions—unlike those from the courts of appeals— do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.'") (quoting Camreta v. Greene, 563 U.S. 692, 709 n. 7 (2011)). Rudman also relies on the Fourth Circuit's decision in Doe v. Fairfax Cty. Sch. Bd., 1 F.4th 257 (4th Cir. 2021), and the Sixth Circuit's decision in G.C. v. Owensboro Pub. Sch., 711 F.3d 623, 631 (6th Cir. 2013). However, the court notes that the Doe

---

[6] Generally, state actors are only liable for their own acts, not for violent acts of third parties. *See*, Rost, 511 F.3d at 1125. However, there are two exceptions to this general rule—the "special relationship" doctrine and the "danger creation" theory. *Id.* at 1126. "[T]he special relationship doctrine exists when the state [has] assume[d] control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Id.* (quotation marks and citation omitted). No circumstances exist to establish a "special relationship" between Rudman and UCO. "[T]he danger creation theory provides that a state may also be liable for an individual's safety if it created the danger that harmed the individual." *Id.* To the extent the Second Amended Complaint can be construed to allege a substantive due process claim based upon the danger creation theory, the court finds that Rudman's factual allegations are not sufficient to state a plausible claim. One of the factors Rudman must satisfy to state a plausible claim is that Robinson's conduct, when viewed in total, shocks the conscience. *Id.* at 1126. To do this, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006) (quotation marks and citation omitted). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* at 1222-23 (quotation marks and citation omitted). The court finds Rudman's factual allegations regarding Robinson's conduct, viewed in total and in favor of Rudman, are not sufficient to rise to the conscience-shocking level.

case involved a Title IX claim, not a § 1983 procedural due process or substantive due process claim.  Also, it was decided after the alleged sexual misconduct in this case occurred.  While the G.C. case involved a § 1983 procedural due process claim based on a de facto expulsion, the court concludes that G.C. does not amount to clearly established weight of authority from other courts for purposes of discerning clearly established law.  The court concludes that the procedural and substantive due process claims should be dismissed with prejudice under Rule 12(b)(6) based upon both prongs of the qualified immunity analysis.

Section 1983 Equal Protection Claim

Rudman asserts that Robinson violated her equal protection rights.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws[.]"  City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (internal quotation marks and citation omitted).

Robinson contends that Rudman's amended pleading fails to state a plausible equal protection claim.  Citing Phan v. Colorado Legal Services, Civil Action No. 18-cv-01403-GPG, 2018 WL 10335669 (D. Colo. June 19, 2018), Robinson contends that Rudman fails to make a "threshold showing" that she was treated differently than others with whom she was similarly situated.  Id. at *3.

In response, Rudman asserts that "this is not the 'class of one' situation" as discussed in Phan.  Doc. no. 35, ECF p. 23.  Rudman asserts that her action against Robinson is "contemplated" by the decisions in Starrett v. Wadley, 876 F.2d 808, 814 (10th Cir. 1989), and Harman v. Oklahoma ex rel. Northern Oklahoma Board of Regents, No. CIV-07-327-C, 2007 WL 1674205 (W.D. Okla. June 7, 2007), and she contends that she has plausibly pleaded such a claim.  Id.

As the court previously explained, the Starrett and Harman cases determined that a supervisor's sexual harassment of a state employee and corresponding

retaliation after complaints were made about the harassment violated the state employee's right to equal protection of the law.  Starrett, 876 F.2d at 814-15; Harman, 2007 WL 1674205, at *5.  However, the alleged sexual harassment in this case was committed by a student, rather than by Robinson or any other UCO employee supervised by Robinson.  The court finds that Rudman's factual allegations do not give rise to an equal protection claim based solely upon the cited authority of Starrett and Harman.

In its prior ruling, the court recognized that the Tenth Circuit has held that "a governmental official or supervisory employee may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." Murrell, 186 F.3d at 1250.  The appellate court determined that the plaintiff had stated a § 1983 equal protection claim against the principal and teachers who "actually knew of and acquiesced in" a student's sexual harassment of another student "by refusing to reasonably respond to it."  Id.

In contrast to its prior ruling, the court concludes that Rudman's new factual allegations, along with the other factual allegations in the Second Amended Complaint, do state a plausible § 1983 equal protection claim under Murrell.  The court finds that Rudman has stated facts sufficient to establish that Robinson actually knew of the sexual harassment/exploitation of new Cheer Team members by upper-class members at the annual "Unofficial" event and consciously acquiesced in that conduct by refusing to reasonably respond to it.

As previously explained, Rudman must show that Robinson violated a constitutional or statutory right—here, an equal protection right—that was clearly established at the time of the conduct in question.  Dahn, 867 F.3d at 1185.  The court concludes that she has.  Since at least the Murrell decision in 1999, the law has been clearly established in the Tenth Circuit that a school principal, teacher, or other administrator may be liable for an equal protection violation if they are deliberately

indifferent to acts of sexual harassment perpetrated on one student by another student.[7]  Therefore, the court concludes that Robinson is not entitled to qualified immunity and Rudman's § 1983 equal protection claim against Robinson is not subject to dismissal under Rule 12(b)(6).

Section 1983 Free Speech Claim

In the Second Amended Complaint, Rudman alleged that Robinson violated her First Amendment right to free speech.  In response to Robinson's motion challenging Rudman's First Amendment claims, Rudman states that she will not "contest" the motion.  The court thus deems the motion confessed in accordance with LCvR 7.1(g).  In its prior ruling, the court concluded that Rudman had failed to state a plausible traditional prior restraint claim or retaliation claim under the First Amendment.  The court dismissed the claims under the first prong of the qualified immunity analysis. Although Rudman has set forth new allegations in the Second Amended Complaint, those factual allegations do not change the court's decision that Rudman has failed to state a plausible traditional prior restraint claim or retaliation claim under the First Amendment.  The court will therefore dismiss Rudman's First Amendment free speech claims with prejudice under Rule 12(b)(6) based on the first prong of the qualified immunity analysis.

V.

For the reasons stated, Defendant, State of Oklahoma, *ex rel*. Board of Regents for the Regional University System of Oklahoma and The University of Central

---

[7] The court notes that in <u>Murrell</u>, the Tenth Circuit denied the school principal and teachers qualified immunity for the plaintiff's § 1983 equal protection claim based on deliberate indifference to known sexual harassment.  In so doing, the appellate court relied upon the holding in <u>Starrett</u> that sexual harassment can violate the Fourteenth Amendment equal protection right and the holding of <u>Woodward v. City of Worland</u>, 977 F.2d 1392, 1401 (10th Cir. 1992), that a person who exercises supervisory authority may be held liable for consciously acquiescing in sexually harassing conduct by a non-state actor over whom the state actor has authority.

Oklahoma's Motion to Dismiss Rudman's Claims (doc. no. 51) is **DENIED**. Plaintiff's Title IX claim against the Board remains pending.

Defendant Kay Robinson's Motion to Dismiss Claims by Plaintiff Sierra Rudman (doc. no. 48) is **GRANTED in part** and **DENIED in part**.  Plaintiff Sierra Rudman's Fourteenth Amendment procedural due process and substantive due process claims and First Amendment free speech claim under 42 U.S.C. § 1983 against defendant Kay Robinson are dismissed with prejudice under Rule 12(b)(6), Fed. R. Civ. P., based upon qualified immunity.  Plaintiff's Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 against defendant Kay Robinson remains pending.

IT IS SO ORDERED this 26th day of April, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

22-0091p010.docx

26